**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

Case No.  **25 - 1 5 0 5**

**EARL TAKEFMAN**

*"Plaintiff",*

v.

**ROBERT J. CORLISS, SR.; CORLISS MOORE & ASSOCIATES, LLC; JEFFREY R. WAXMAN; CARL N. KUNZ, III; MORRIS JAMES LLP; SERENGETI ASSET MANAGEMENT, L.P.; A.J. MARTINEZ; GHOST TREE PARTNERS, LP; MARK FOX, and MARK GUEST**

*"Corliss Defendants"*

and

**MJM TECH LIMITED, PAUL SLOYAN and ARRAN STEWART**

*"MJM Defendants"*

_____ /

**COMPLAINT FOR CIVIL CONSPIRACY,
FRAUD, AND AIDING AND ABETTING FRAUD (Demand for Jury Trial)**

*"Truth does not hide. Only those afraid of it do. An honest man fears no question."*

**Anonymous Proverb**

This is an action for fraud, civil conspiracy, aiding and abetting fraud, negligent misrepresentation, unjust enrichment, and related causes of action arising from the submission of a materially false sworn declaration in a Delaware bankruptcy proceeding asserting that a $30 million asset known as the TEAM AI software and related intellectual property had been transferred to the bankruptcy Debtor (the "Debtor" or "JOB") when, in fact, no such transfer

1

occurred[1]. Despite the magnitude of the alleged transaction, Defendants have never produced - nor even identified - any operative transaction agreement, intellectual-property assignment, board or shareholder approvals, closing documents, escrow instructions, wire confirmations, valuation materials, tax filings, regulatory notices, amended intellectual property registrations, or post-closing integration records executed by or even known to the alleged transferor, who categorically denies that any such transfer occurred or can be proven. Instead, the Corliss Defendants rest solely on a conclusory declaration made under oath by a turnaround specialist, chief executive hired by the secured lenders, who refuses to supply any transactional documentation of any kind that necessarily accompanies the lawful transfer of a multi-million-dollar intellectual-property asset. His false declaration was then used to effectuate the sale of the asset through the bankruptcy process, since the rightful owner of the asset, a company residing in England, was unable to appear in bankruptcy court to object to the sale of its property.

Through that false declaration and the conduct described below, the Corliss Defendants caused the destruction of the value of a multi-million-dollar debt and the economic rights lawfully assigned to Plaintiff.

## I. OPENING STATEMENT

If a store employee accuses you of stealing an item, but you have the payment receipt in your pocket, you don't spend months arguing - **you simply show them the receipt**. No reasonable person would fight the request unless they didn't have the receipt.

---

[1] The Debtor is case number 25-11280 (KBO) is companies relating to My Job Matcher, Inc. d/b/a job.com

This is a case of brazen corporate deceit, where a cabal of powerful insiders - executives, lawyers, and lenders - cloaked a multi-million-dollar asset grab in the solemn veil of a federal bankruptcy court. At its heart lies a single, audacious lie: a sworn declaration under oath, falsely claiming ownership of the TEAM AI intellectual property and software - a crown jewel originally purchased in 2023 for $30 million, rightfully purchased and owned by MJM Tech Limited ("MJM"), a United Kingdom entity in which Plaintiff holds shares and is a significant creditor. That declaration, filed by Defendant Robert J. Corliss, Sr. ("Corliss"), as CEO of the Debtor My Job Helper, Inc ("JOB"). in bankruptcy, and a follow up declaration by Mark Guest ("Guest"), was not born of innocent error but of deliberate conspiracy, propped up time and again by his co-Defendants despite repeated warnings, ample opportunities for correction, and desperate pleas to avert this very litigation.

The Corliss Defendants, spanning management firms like Corliss Moore & Associates, LLC; bankruptcy counsel at Morris James LLP led by Jeffrey R. Waxman and Carl N. Kunz, III; and secured lenders including Serengeti Asset Management, L.P. (with its key signatory A.J. Martinez) and Ghost Tree Partners, LP (overseen by Mark Fox) - had every chance to dismantle this fraud before it metastasized. Plaintiff, and other vigilant shareholders of MJM, alerted them repeatedly: in pre-bankruptcy correspondence, during due diligence windows, and even in the shadow of the filing deadline. ***"You do not own this asset,"*** Plaintiff implored, offering a simple offramp: Produce the transfer documents, board resolutions, shareholder consent, assignment agreements, or any thread of legitimate paperwork, and spare us all the scorched earth of court. Avoid the hemorrhaging legal fees, the sleepless nights, the reputational stain. Just show the proof, *show your receipt*, and Plaintiff would withdraw, tail between his legs, with apologies tendered.

3

Unfortunately, the only apparent explanation is that the alleged "transfer" exists solely by virtue of an internal, self-serving, "voodoo" accounting characterization rather than a legally operative conveyance. An accounting treatment does not affect a legal transfer of title. A ledger entry is not a conveyance. And an internal reclassification does not substitute for executed transfer instruments when ownership of a $30 million asset is at issue.

The Corliss Defendants ignored the Plaintiff. Every time. Stonewalled. Deflected. Doubled down. Why? This Court needs only to pose the question that Defendants dread: If the $30 million TEAM AI asset was truly transferred to JOB as sworn under oath, why the frantic refusal to produce a single scrap of supporting evidence? Assets of this magnitude do not vanish into ether without a trace - without meticulously documented board meetings, shareholder approvals, wire transfer confirmations, or chains of correspondence memorializing the handoff. In the hyper-regulated world of intellectual property and corporate finance, such a transfer would leave a paper trail as wide as the Delaware River. Moreso, is the Court to believe that the two individuals most familiar with the asset, after purchasing it for $30 million, forgot that it was legally transferred to the Debtor? Or are they perhaps the individuals who are lying to this Court?

Most notably, in various bankruptcy court pleadings, the Corliss Defendants proffer nothing including in pleadings with Plaintiff where they produced over **300 pages** of arguments and exhibits. Nada. Zilch. They demand blind faith in a declaration they know to be perjured, all to grease the wheels of a sham $35 million credit bid sale to the secured lenders that siphoned the asset to the Debtor's subsidiary, enriching the conspirators at Plaintiff's expense.

The answer is as plain as it is damning: The asset was never transferred. There is no proof because there was no transaction - only a calculated fiction, hatched in backroom huddles and

4

sealed with knowing signatures, to perpetrate a blatant fraud on the bankruptcy Court and plunder MJM's value. Defendants' conspiracy did not end with the filing; it endures in their scorched-earth tactics, as they will marshal jurisdictional feints and procedural barricades to bury discovery under avalanches of motions and fees - tens of thousands of dollars in legal fees, no doubt, in a desperate bid to shield their lie from the light.

But truth, like gravity, cannot be indefinitely evaded. Like in the Wizard of Oz, the curtain will be removed revealing the truth. Through the depositions and document productions this Court will authorize, the veil will tear: emails exposing the warnings ignored, diligence reports redacted to conceal the void, and admissions that the "transfer" was mirage, not reality.

Plaintiff brings this action not for vengeance, but for justice - for the sanctity of oaths sworn in federal court, for the vindication of lawful ownership, and for the unmasking of those who would game the system for personal gain. Defendants' silence speaks volumes; now, let their defenses, or lack thereof, speak the rest. This Court has the power, and the duty, to demand answers. Plaintiff respectfully prays it does so, swiftly and without mercy for the meretricious.

## ADDITIONAL MISCONDUCT BY THE MJM DEFENDANTS

But the fraud did not originate, or end, with the Corliss Defendants. It metastasized because the **MJM Defendants** themselves, the very stewards entrusted with safeguarding MJM's assets, abdicated their duties with breathtaking negligence. These individuals and entities, including MJM's directors, officers, and controlling insiders, had a legal and fiduciary obligation to preserve the company's assets, protect shareholder value, and ensure compliance with corporate governance and UK law. Instead, they presided over, permitted, or recklessly ignored the

5

disappearance of an asset purchased for $30 million, a loss so catastrophic it beggars belief. Worse still, they failed to uphold even the most rudimentary corporate responsibilities or raise alarms when the TEAM AI intellectual property was falsely declared to belong to an entirely different entity.

Their dereliction created the perfect vacuum in which the Corliss Defendants' scheme could flourish. It was the MJM Defendants' **gross negligence**, indifference, and governance collapse that allowed an asset of this magnitude to be misappropriated, misrepresented, or abandoned without a trace. They simply allowed the fraud to metastasize until the value of MJM, and its creditors and shareholders, was wiped out.

In this sense, the MJM Defendants were not bystanders. They were accelerants. Their failures enabled the fraud, facilitated the misrepresentation, and ultimately destroyed the value of the asset. Through this misconduct, by action and by omission, they directly contributed to the harm suffered by Plaintiff and to the destruction of a corporate asset entrusted to their care.

The result is the same as if they had personally signed the false declaration: a $30 million asset gone, a shareholder left with worthless equity, and a creditor's rights annihilated.

Plaintiff brings claims against both groups of Defendants because their misconduct, fraud by one group, gross negligence by the other, operated in tandem to produce the same outcome: the unlawful disappearance of the TEAM AI asset and the devastation of MJM's value.

## II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists.

1.  Plaintiff is a citizen of Florida.

2.  Defendants are citizens of Delaware (Morris James LLP, Waxman, Kunz), Georgia (Corliss Sr., Corliss Moore), Texas (Guest, Stewart), New York (Serengeti, Martinez), California (Ghost Tree), Connecticut (Fox), the United Kingdom (MJM Tech Limited), and Monaco (Sloyan). No Defendant shares Plaintiff's Florida citizenship.

3.  Personal jurisdiction exists under Delaware's long-arm statute, 10 Del. C. § 3104, because Defendants purposefully availed themselves of Delaware by filing pleadings, submitting sworn declarations, conducting transactions, and obtaining judicial relief in the United States Bankruptcy Court for the District of Delaware, thereby causing tortious injury in this forum.

4.  Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, including the filing of the false declaration and related bankruptcy pleadings, and all Defendants engaged in conduct causing injury here.

## III. WHO IS PLAINTIFF EARL TAKEFMAN AND WHY HE HAS DIRECT, PERSONAL STANDING

5.  Michael Maurizio is a multi-million-dollar creditor of MJM (approximately $4.2 million) and a minority shareholder, who sold them his company.

6.  Mr. Maurizio executed a comprehensive, irrevocable deed of assignment transferring to Plaintiff Earl Takefman ("Plaintiff" or "Takefman") all his rights, title, and interest in the debt

owed to him by MJM, together with all related enforcement rights and causes of action arising from the conduct described herein **(Exhibit A).**

7.   The assignment is valid under United Kingdom law and United States law and was executed in compliance with applicable legal requirements.

8.   Plaintiff is therefore the real party in interest under Rule 17 and is entitled to enforce the assigned claims in his own name.

9.   Plaintiff does not assert derivative shareholder claims. His injuries arise directly from the destruction of the value of the assigned creditor rights.

## IV. THE PARTIES

10. Plaintiff Earl Takefman is an individual residing in Miami, Florida. He has been assigned the litigation rights of Michael Maurizio, a creditor and a shareholder of MJM, a UK company owning intellectual properties which include the TEAM AI software (purchased for $30 million).

### The Corliss Defendants

**(i)   The Alleged False Declaration Defendants**

11. Defendant **Robert J. Corliss, Sr**. ("Corliss") is a Georgia resident and purported CEO of JOB, who filed a false declaration (Bankruptcy Court Docket #13, **Exhibit B**)) in Case No. 25-11280 (KBO).

12. Defendant **Corliss Moore & Associates, LLC** ("Corliss Moore") is a Utah-based company that was hired to manage JOB by the secured lenders.

13. Defendant **Mark Guest** ("Guest") is a Texas resident and is seemingly an employee of JOB who filed an affidavit in support of the sale of the TEAM AI asset to the stalking horse purchaser (Bankruptcy Court Docket #267, **Exhibit C**). Guest's affidavit is heavily redacted

such that Plaintiff is unable to determine its exact contents. The Corliss Defendants have refused to supply an unredacted copy of his affidavit.

### (ii) The Alleged Co-Conspirator Defendants (The Lawyers)

14. Defendant **Jeffrey R. Waxman** ("Waxman") is a Delaware resident and the lead attorney for the Debtor who works at the law firm, Morris James LLP.

15. Defendant **Carl N. Kunz, III** ("Kunz") is a Delaware resident and an attorney at Morris James LLP, counsel for JOB.

16. Defendant **Morris James LLP** ("Morris James") is a Delaware law firm who employs Waxman and Kunz.

### (iii) The Alleged Co-Conspirator Defendants (The Secured Creditors)

17. Defendant **Serengeti Asset Management L.P.** ("Serengeti") is a New York based secured lender to JOB.

18. Defendant **A.J. Martinez** ("Martinez") is a New York resident, Partner and Chief Legal Officer at Serengeti, who signed affidavits/documents in the Bankruptcy Case.

19. Defendant **Ghost Tree Partners, LP** ("Ghost Tree") is a California limited partnership, secured lender to JOB.

20. Defendant **Mark Fox** ("Fox") is a Connecticut resident, Managing Partner at Ghost Tree.

**The MJM Defendants**

21. Defendant **MJM Tech Limited ("MJM")** is a UK based company that owns the TEAM AI operating system and related intellectual properties which they paid $30 million to acquire in 2023.

22. Defendant **Paul Sloyan** is a resident of Monaco. Paul was the chief executive who managed and operated JOB until he was terminated by Corliss after filing for bankruptcy protection in early July 2025. He is presently the chief executive of MJM, the owner of the TEAM AI assets.

23. Defendant **Arran Stewart** is a Texas resident who was an officer and director of JOB before he was also terminated by Corliss. He is also an officer and director of MJM.

## V. REPEATED REQUESTS BY PLAINTIFF AND OTHER PARTIES FOR THE CORLISS DEFENDANTS TO *"SHOW THEIR RECEIPT"* TO AVOID LITIGATION AND SPARE THE COURT'S RESOURCES

*"An honest man fears no question"*

24. MJM owns the TEAM AI IP/software, critical to its value as a UK entity, which it purchased from its owner and creator Erin Wilson ("Wilson") in 2023 for $30 million.

25. On July 6, 2025 (Bankruptcy Court Docket #13), Corliss in a declaration made to the bankruptcy court under penalty of perjury, said as follows on page 6, paragraph 15 (**Exhibit B**):

> extensive Patent Portfolio.[8]  Upon information and belief, following the closing of the TeamAI
>
> Transaction, non-Debtor affiliate Job.com-Team.ai Inc. transferred ownership and control of the
>
> TeamAI OS to Debtor Job.com and certain of the other Debtors, which included depositing and

26. This was a false statement in that "non-Debtor affiliate Job.com-Team.ai Inc." did not transfer ownership and control of the TEAM AI to JOB.

27. On July 16th, 2023, in case Corliss might have been misled or was misinformed, Sloyan, who as the former chief executive of JOB and obviously would have knowledge of any transfer of ownership, on behalf of MJM, wrote to Corliss, with copies to all the other Defendants herein, and confirmed the following: **(Exhibit D):**

- That MJM is the parent company of Job.com-Team.ai Inc.
- That the declaration made by Corliss was incorrect as ***"no such transfer of ownership has been or was effected at law or in fact".***

28. MJM further urged Corliss to correct the record, or alternatively to provide MJM with *"copies of documents that you believe evidence or effectuate the purported transfer of ownership of the Team AI OS" to any of the Debtors".*

29. Furthermore, MJM further asked Corliss to amend his declaration to correct the record.

30. On August 18, 2025, (Bankruptcy Court Docket #161) another shareholder of MJM, Mr. Paul Olynyk, sent a similar letter to the court confirming that the asset was never transferred **(Exhibit E).**

31. On September 3, 2025, (Bankruptcy Court Docket #174), yet another MJM shareholder, Mr. Raffaele Cotroneo, advised the court that the asset was not owned by the Debtor and had never been transferred **(Exhibit F).**

32. On September 19th, 2025, Wilson, the creator and developer of the TEAM AI software, who obviously was most informed about any transfer or sale of TEAM AI, filed an objection to the sale of the TEAM AI (Bankruptcy Court Docket #220, **Exhibit G**) stating

*"Despite Mr. Corliss' statement in the First Day Affidavit, there is no evidence that the Team.ai Assets have been transferred to any of the Debtors, nor that the Debtors have any other rights to the Team.ai Assets. Thus, the Debtors have no "legal or equitable interests" in the Team.ai Assets".*

33. Since MJM is a small UK company with limited resources and is attempting to raise money to survive, it could not afford to hire expensive legal counsel in the bankruptcy court to argue its ownership, relying on the good faith of the Court and Corliss to properly advise the court of the challenges to the ownership.

34. In fact, when counsel, on behalf of Wilson, tried to argue before the court he was rejected as not having standing, such that the court never heard his challenge to Corliss' false declaration.

35. Consequently, there was no party to challenge the ownership of the TEAM AI asset, and neither Corliss nor JOB's counsel properly advised the court of the challenges to the false declaration, instead relying on the declarations of Corliss and Guest[2] to mislead the court.

36. In a November 6th, 2025, filing, Plaintiff attempted to have the bankruptcy court compel proof of the transfer, which was rejected because remote testimony was not allowed by the Court. The Court also refused to ask the U.S. Trustee to investigate the false declaration **(Exhibit H).**

37. On November 26th, 2025, Plaintiff sent an e-mail to all the Defendants requesting an unredacted copy of Guest's affidavit, which was ignored by the Defendants **(Exhibit I).**

38. On December 2, 2025, in yet another attempt to get the Corliss Defendants to ***"show me their receipt"*** and avoid litigation, Plaintiff sent all Defendants one last e-mail in an attempt avoid litigation, which once again they ignored **(Exhibit J).**

---

[2] Mr. Guest highlighted in his declaration that while Mr. Wilson worked for the Debtor that all improvements and inventions that he may have created belonged to the Debtor, as if to say that if you lease a Ferrari, and add a new paint job and new tires, that you get to keep the Ferrari because of the improvements you made.

39. The Corliss Defendants all knew of the falsity: Serengeti/Martinez and Ghost Tree/Fox conducted due diligence but ignored/ concealed MJM's ownership; Corliss Moore managed JOB to facilitate the lie; Waxman/Kunz/Morris James drafted/filings despite knowledge; all seemingly agreed via communications/meetings to defraud the court/shareholders like Plaintiff.

40. As a direct result, Plaintiff suffered personal damages exceeding $75,000 because he can no longer collect the debt owing to him by MJM because of the misrepresented declaration by Corliss and Guest, causing personal investment losses.

41. No relief sought affects the bankruptcy estate or unwinds the sale; this is a direct tort claim.

## VI. THE UNTENABLE AND CONTRADICTORY RELATIONSHIP BETWEEN THE DEBTOR AND MJM: CORLISS REVEALS THAT NO TRANSFER EVER OCCURRED

42. The bankruptcy court awarded the TEAM AI asset to the Debtor's stalking horse bidder, JOB, based solely on the false sworn declaration of Corliss, and potentially that of Guest.

43. This purported "award," however, amounts to little more than an empty judgment: JOB lacks the source code, exerts no control over development, and employs neither Wilson nor the TEAM AI engineering team.

44. Wilson, a former JOB employee, has since departed and now works exclusively for MJM, where he continues to advance the very TEAM AI software that JOB claims to own.

45. As MJM has confirmed to Plaintiff, the Delaware bankruptcy court's ruling carries no weight in the United Kingdom; JOB would need to litigate ownership anew in a foreign court to assert any control over the software.

46. In essence, JOB's claimed ownership resembles title to a fortified safe said to hold a priceless secret - yet without the key, the combination, or even knowledge of the safes whereabouts.

47. Meanwhile, MJM struggles to secure funding for survival and ongoing development, efforts hamstrung by a court order granting an asset that MJM continues to hold and operate in practice.

48. Stewart, a director of MJM, confided to Plaintiff that he views the TEAM AI software as having $1 billion in potential value.

49. Necessity has forced communication between JOB, the nominal "owner" and MJM, the actual possessor, reversing roles such that the "thief" and "victim" must now collaborate, per Sloyan.

50. Sloyan further disclosed to Plaintiff that Corliss sought to pressure him into "transferring" the software by dangling the **prospect of reemployment**; an overture Sloyan rebuffed.

51. Compounding this, Corliss and Sloyan are presently negotiating for MJM to repurchase from JOB all intellectual properties JOB purports to own, including TEAM AI itself.

52. JOB <u>wields leverage solely through its misleading declaration</u>, effectively compelling MJM into these talks merely to reclaim practical dominion over assets that were never truly conveyed.

53. Silenced by the stakes, Sloyan refrains from publicly contesting Corliss or aligning with Plaintiff, fearing reprisal that could derail the delicate fundraising negotiations on which MJM's future hinges.

54. Plaintiff, thrust into the role of common foe, now witnesses an alliance forged in adversity: not mere metaphor, but the precise dynamic of *"the enemy of my enemy is my friend"*, one tainted by mutual reliance on the very deception that precipitated this impasse.

## VII.  CAUSES OF ACTION

### A.  COUNTS AGAINST THE CORLISS DEFENDANTS

### COUNT I – CIVIL CONSPIRACY

39.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

40.    The Corliss Defendants combined, agreed, and acted in concert to commit an unlawful act: **the perpetration of fraud on MJM, its creditors, its shareholders,** and this Court, by submitting and supporting a knowingly false sworn declaration asserting ownership of the TEAM AI operating system and IP.

41.    Each Defendant knowingly participated in the scheme by (a) drafting, reviewing, or approving the false filings, (b) facilitating the sham transfer narrative, and/or (c) concealing the absence of any supporting corporate documentation.

42.    Defendants acted with specific intent to deceive the bankruptcy court, to manipulate the sale process, and to injure Plaintiff in his capacity as creditor-assignee and shareholder.

43.    As a direct and proximate result, Plaintiff suffered financial injury, including loss of the value of his assigned debt and diminished economic value.

### COUNT II – FRAUD

44.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

45.   Defendants knowingly made materially false representations, including but not limited to:

    (a) claiming the Debtor owned the TEAM AI software;

    (b) submitting a sworn declaration containing false statements of title;

    (c) failing to disclose that no transfer documents existed.

46.   Defendants acted with scienter - knowledge of falsity and intent to induce reliance by the bankruptcy court, creditors, and shareholders.

47.   Plaintiff justifiably relied on the accuracy and legality of representations submitted under oath to a federal court and suffered damages as a direct and proximate result.

## COUNT III – AIDING AND ABETTING FRAUD

48.   Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

49.   Each Defendant, other than Robert J. Corliss himself, **knowingly provided substantial assistance** to the fraudulent declaration and its perpetuation, including:

    (a) legal drafting,

    (b) due diligence omissions,

    (c) financing and facilitating the sham credit bid,

    (d) concealing the truth despite warnings.

50.   Each Defendant knew the declaration was false, or acted with reckless disregard, and their assistance was a substantial factor in causing Plaintiff's damage.

## COUNT IV – FRAUD ON THE COURT

51.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

52.    Defendants intentionally defiled the judicial process by submitting a materially false sworn declaration to the bankruptcy court.

53.    This conduct constituted a deliberate scheme to improperly influence judicial action and subvert the integrity of the bankruptcy sale.

54.    Such conduct warrants compensatory damages, punitive damages, court costs (under court's inherent authority), and all equitable relief necessary to remedy the fraud.

## COUNT V – NEGLIGENT MISREPRESENTATION

55.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

56.    In the alternative to scienter allegations, Defendants owed a duty to exercise reasonable care in making representations to the bankruptcy court and interested stakeholders.

57.    Defendants breached that duty by making statements without verifying ownership, failing to review corporate records, and ignoring multiple warnings.

58.    Plaintiff reasonably relied on these representations, resulting in economic damage.

**COUNT VI – UNJUST ENRICHMENT**

59.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

60.    The fraudulent declaration facilitated a sale process that benefitted:

(a) lenders through improper credit bidding,

(b) management firms through fees,

(c) insiders through retention of control or assets.

61.    Equity requires disgorgement of all benefits unjustly obtained.

**B. COUNTS AGAINST THE MJM DEFENDANTS**
*(Direct claims for negligence, fiduciary breaches, and governance failures)*

**COUNT VII – GROSS NEGLIGENCE**

62.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

63.    The MJM Defendants owed duties to safeguard corporate assets, maintain governance, protect shareholder value, and ensure compliance with UK and U.S. legal standards.

64.    They breached these duties by:

(a) failing to maintain or preserve transfer records,

(b) failing to respond to false statements about ownership,

(c) failing to conduct required corporate oversight,

(d) failing to rectify or investigate the fraudulent declaration.

65.    Their omissions rose to the level of **gross negligence**, resulting in catastrophic loss of a $30 million corporate asset and Plaintiff's resulting damages.

**COUNT VIII – BREACH OF FIDUCIARY DUTY**

66.   Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

67.   As directors, officers, and controlling insiders of MJM, these Defendants owed duties of care, loyalty, candor, and oversight to creditors and shareholders.

68.   They breached these duties by:

(a) failing to prevent the misappropriation of TEAM AI,

(b) ignoring warnings about fraudulent filings,

(c) failing to protect MJM's interests during the Debtor's bankruptcy,

(d) permitting a material corporate asset to vanish without documentation.

69.   These breaches directly caused Plaintiff's financial injuries.

**COUNT IX – CORPORATE WASTE**

70.   Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

71.   The MJM Defendants allowed a $30 million asset to be lost, misappropriated, or transferred without any oversight, documentation, authorization, or compensation.

72.   This constitutes corporate waste under both Delaware and UK principles of corporate governance.

73.   Plaintiff suffered injury due to the resulting destruction of corporate value.

**COUNT X – NEGLIGENT SUPERVISION AND FAILURE OF OVERSIGHT**

74.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

75.    The MJM Defendants failed to supervise those responsible for corporate asset management, governance, and legal compliance.

76.    Their failure permitted the Corliss Defendants' fraud to go undetected and unchallenged.

77.    This failure of oversight - akin to **a Caremark violation** - proximately caused Plaintiff's damages.

**COUNT XI – AIDING AND ABETTING THE CORLISS FRAUD (By Omission)**

78.    Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

79.    The MJM Defendants knowingly or recklessly allowed false statements about TEAM AI ownership to be made and relied upon in court.

80.    By failing to object, correct, or disclose contrary information in their possession, they substantially assisted the Corliss Defendants' fraud.

81.    This aiding and abetting caused Plaintiff's economic injuries.

**COUNT XII – DECLARATORY JUDGMENT**

81. Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

82. An actual controversy exists regarding Plaintiff's rights under the assignment and Defendants' liability.

83. Plaintiff seeks a declaration confirming his lawful status as assignee and creditor with enforceable claims arising from the TEAM AI asset.

## COUNT XIII – PUNITIVE DAMAGES
*(Against All Defendants)*

84. Plaintiff incorporates by reference Paragraphs 1 to 54, including the Opening Statement.

85. The conduct of both the Corliss Defendants and the MJM Defendants was outrageous, malicious, deceitful, and undertaken with reckless disregard for Plaintiff's rights.

86. Punitive damages are warranted to deter similar misconduct.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and award the following relief:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages as permitted by law;

c. Pre-judgment and post-judgment interest;

d. Reasonable costs and such further monetary relief as permitted;

e. A trial by jury on all issues so triable; and

f. Such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of December 2025 by:

/s/ Earl Takefman

**Earl Takefman, Pro Se**
**Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that no parties have yet been served because this Complaint is being filed prior to the issuance of summonses. Plaintiff has sent an e-mail to each defendant and will promptly serve each Defendant with the Complaint and summons in accordance with Federal Rule of Civil Procedure 4 and will file proofs of service with the Court upon completion of service. If any Defendant evades service or cannot be located with reasonable diligence, Plaintiff will seek leave of Court for alternate service pursuant to Rule 4.

/s/ Earl Takefman

**Earl Takefman, Pro Se**
**Plaintiff**