# EXHIBIT B

**Corliss False Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MY JOB MATCHER, INC., *et al.*,[1] | Case No. 25-11280 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF ROBERT J. CORLISS IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Robert J. Corliss, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

1.    I am the Chief Executive Officer of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"). I was appointed to this role on May 7, 2025. I have over thirty-five years of experience serving in a variety of roles, including in management and advisory positions, and am the Founder and Chairman of CorlissMoore & Associates ("**CorlissMoore**"), a management and advisory services firm. CorlissMoore was first engaged by the Company in February of 2025. In that capacity, and in my capacity as the Chief Executive Officer of the Debtors, I have been directly involved and obtained first-hand knowledge of the events and circumstances leading to these chapter 11 cases, and am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.    All facts set forth in this declaration (this "**Declaration**") are based on: (a) my personal knowledge; (b) my communications with members of the Debtors' management team

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: My Job Matcher, Inc. (9880); Job.com-HV, Inc. (DE) (5873); Job.com-HV, Inc. (FL) (5873); Job.com-Fortus, Inc. (6145); Job.com-Endevis, Inc. (1956); Job.com-QCI, Inc. (4364); Princeton One-Job.com, Inc. (4752); and Princeton Search L.L.C. (6163). For purposes of these chapter 11 cases, the Debtors' service address is 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060.

and the Debtors' consultants and professional advisors (collectively, "**Company Representatives**"); or (c) my opinions developed through my overall professional experience, personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

3.       If called as a witness, I could and would testify competently to the matters set forth herein based on the foregoing. My testimony is further based on my review of the Debtors' books and records and other relevant documents and information compiled and communicated to me by Company Representatives. I am duly authorized to submit this Declaration on behalf of the Debtors.

4.       Today (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"). The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "**Chapter 11 Cases**").

5.       This Declaration is submitted: (a) to provide a brief overview of the Debtors and these Chapter 11 Cases; and (b) in support of the Debtors' chapter 11 petitions and "first day" motions and applications (collectively, the "**First Day Pleadings**"), which have been filed to minimize the adverse effects of the Debtors' filing for chapter 11 protection, and to enhance the Debtors' ability to maximize value for the benefit of their estates and creditors through the chapter 11 process, including the contemplated sale of all or substantially all of their assets pursuant to what I anticipate may be a robust auction and sale process.

6.       This Declaration is organized into the following sections: *Section I* provides a brief overview of the Debtors' business and history; *Section II* summarizes the Debtors' equity

17411232

ownership and capital structure; *Section III* describes the circumstances that led to the commencement of these Chapter 11 Cases as well as the Debtors' objective for these Chapter 11 Cases and the contemplated means by which that objective will be met; and finally *Section IV* provides an overview of the First Day Pleadings.

7.    A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as **Exhibit 1** (the "**Org Chart**").

## I.    The Debtors' Business & Corporate History

### A.    Business Operations

8.    The Company owns and has developed state-of-the-art recruitment technology through its cutting-edge, AI-driven recruitment platform that redefines efficiency in recruiting, hiring, and placement. The Job.com[2] platform operated by the Debtors offers a complete one-stop shop for staffing and integrates advanced automation across the hiring lifecycle, from candidate attraction and matching to virtual interviewing and placement. One of the central products offered through Job.com is the autonomous interviews and qualification engine. This revolutionary solution allows clients to simultaneously interview thousands of candidates through virtual, AI-conducted interviews and provides hiring managers with immediate, AI-analyzed candidate summaries. Other products include interview guides, project management solutions, job boards, and reporting and analytics suites.

9.    Recognizing the significant inefficiencies in the global staffing industry, the Company embarked on a strategy to revolutionize traditional staffing methods through technological solutions, such as artificial intelligence ("**AI**"). I understand that the Company began its technology development in or about 2021 or earlier. Around this time, the Company

---

[2]    "Job.com" is a registered trademark of Debtor My Job Matcher, Inc.

17411232

recognized the existence of a significant opportunity in the technological automation of human resources (known as, "**HR Tech**"). The Company then embarked on the digitization of the staffing process through platforming a true business-to-consumer experience for the method of recruitment and staffing, while applying the latest AI and machine learning ("**ML**") strategies. The Company focused its technology development on methods and apparatus for (a) how AI in recruitment matches candidates, (b) validation and storage of resume records, (c) applicant tracking flow, and (d) video resume and video application processes. The strategy was to create a digital world-class fully digitized online marketplace for both job seekers and employers to shop for and fulfill their human resources needs at optimal levels.

10.     Starting in September 2021, Debtor My Job Matcher, Inc. ("**Job.com**") applied for and/or was granted dozens of patents relating to its development of this suite of technology assets. These patents and/or applications relate to a variety of the Company's developed and in-development technology and software assets such as:

- Applicant tracking (September 2021)

- Applicant classification (January 2022)

- Methods for generating video avatar (January 2022)

- Job candidate tracking (February 2022)

- Job candidate classification (February 2022)

- Classifying and neutralizing bias in job applications (January 2022)

- Systems and methods for predictive scoring (February 2022)

- Methods for employment application assessment (March 2022)

- Methods for rating the quality of a posting (November 2022)

- Inserting text into a video resume (December 2022)

4

- Parsing solicitation video content (January 2023)

- Parsing and comparing video resume duplications (February 2023)

11.     Collectively, the Company's patents (granted and pending) involve AI-enabled extraction of content and data from candidate video interviews which is then analyzed through software that provides prospective employers with job-matching analytics to match job seekers with their job openings with superior results to traditional hiring models.

12.     Currently, Debtor Job.com has approximately 39 patents registered in its name, and approximately 42 patent application pending, all of which were filed between September 2021 and August 2023.  The records of the Company also indicate that the Debtors own 257 trade secrets and could have as many as 9 trademark applications pending.[3]  Debtor job.com also owns over 200 domain names.

13.     As part of its technology expansion, on January 25, 2023, Debtor Job.com hired a new Chief Technology Officer to, among other things, "define and execute the technology strategy to transform and grow Job.com's business," "foster[] innovation" and "[f]urther Job.com's global technology road map."[4]  In August of 2023, Debtor Job.com announced that all of its service applications—traditional staffing and technology—were united under the ownership of Job.com.[5] In a press release, Debtor Job.com promoted its vast technology suite:

> Job.com's proprietary tech applies Artificial Intelligence and Machine Learning processes to attract talented people to the right jobs and removes inefficient tasks from the hiring process.  By removing unnecessary steps and wait time, layering in automation, and applying AI, candidates can connect with recruiters and hiring managers faster for more high-value interactions. Each acquisition provides an opportunity for the AI to continue

---

[3]     Collectively, the Company's intellectual property assets are referred to herein as the **"Patent Portfolio."**

[4]     Employment letter from Job.com to Mir Ali, Chief Technology Officer dated January 25, 2023.

[5]     https://finance.yahoo.com/news/job-com-offers-ai-powered-140000394.html.

5

learning from new data and subsequently delivers a more effective and efficient hiring process for recruiters and job seekers alike.

*          *          *

With its new focused, united structure, Job.com will reach more clients and candidates, and further revolutionize the recruitment industry through its proprietary technology, intelligent AI and data-driven solutions. The integration marks a significant leap forward for the company and showcases Job.com's unwavering commitment to excellence in talent acquisition and industry innovation.[6]

14.     To compliment, and continue to build and develop, its technology platform, in September 2023, non-Debtor affiliate Job.com-Team.ai Inc.[7] (a Delaware corporation) acquired the stock of an unrelated, third-party technology developer, Team.AI Corp. (**"TeamAI"**) (a Delaware corporation) (the "**TeamAI Transaction**").  As part of the TeamAI Transaction, Debtor Princeton Search, LLC and Debtor Job.com executed agreements to employ or independently contracted with the former leadership team (the "**Job.com Tech Team**") at Team.AI Corp and Debtor Job.com separately retained the former TeamAI software development team.

15.     Following the TeamAI Transaction, the Job.com Tech Team would further develop the technology that Team.AI Corp. had developed — a video-based hiring operating system (the "**TeamAI OS**")—and to use the TeamAI OS to compliment the extensive existing and in-development technology of Job.com that would, among other things, capitalize on Job.com's extensive Patent Portfolio.[8]  Upon information and belief, following the closing of the TeamAI Transaction, non-Debtor affiliate Job.com-Team.ai Inc. transferred ownership and control of the TeamAI OS to Debtor Job.com and certain of the other Debtors, which included depositing and

---

[6]     https://finance.yahoo.com/news/job-com-offers-ai-powered-140000394.html

[7]     The Debtors understand that Job.com-Team.ai Inc. is a wholly owned subsidiary of MJM Tech Ltd.

[8]     Based on the Debtors' research, none of MJM Tech Ltd., Job.com-Team.AI Inc. or Team.AI Corp. have any pending or granted patent applications.

6

storing all of the source code, improvements and all components thereof into a GitHub exclusively owned and controlled by Debtor Job.com. And all of the future cash consideration due to TeamAI and its affiliates relative to the TeamAI Transaction, such as cash payments and earn-outs, were booked as liabilities on the balance sheet of Debtor Job.com.

16.     Following the TeamAI Transaction, Team.AI Corp. announced that it was acquired by Job.com, which is a trademark of Debtor Job.com.[9]

17.     From and after the closing of the TeamAI Transaction, the Debtors continued to develop their technology platform extensively under the oversight of the Job.com Tech Team at the exclusive cost of the Debtors. Using the Debtors' proprietary and patented technology, the Debtors created a one-of-a-kind technological solution for the staffing industry.

18.     The Company also provides traditional staffing services, operating three staffing businesses: HireVergence, Fortus, and Endevis. Through HireVergence, which was acquired by the Company in 2020, the Debtors offer information technology and cyber security staffing services. HireVergence provides cybersecurity and IT professionals with contract, contract-to-hire, and direct hire positions at various different companies nationwide. Fortus, which was acquired by the Company in 2021, provides healthcare staffing services across the United States, with established relationships with key hospitals, long-term care facilities, and other healthcare providers. Fortus specializes in the direct and travel placement of healthcare professionals with an emphasis on nursing. Finally, Endevis is the Debtors' general staffing business unit, which provides temporary staffing services to clients in a variety of industries, with an established presence in the industrials and materials sector.

---

[9]     https://www.linkedin.com/company/team.ai/

17411232

19.     The Debtors currently have approximately 21 full- and part-time employees and/or independent contractors that support the business in further developing its technology suite, managing and operating its traditional staffing and recruiting business and operating the "back office." In addition, the Debtors have approximately 60 employees employed by the Debtors on a seasonal or temporary basis.

20.     The Debtors previously operated QCI, which provided per diem healthcare workers, and PrincetonOne, a talent solutions provider with an emphasis on recruitment process outsourcing and permanent recruitment services. However, the Debtors sold the assets of PrincetonOne in June of 2024 to Hueman People Solutions. In addition, for the reasons discussed below, the Debtors were forced to close QCI in February of 2025. As a result, Princeton One-Job.com, Inc., Princeton Search L.L.C., and Job.com-QCI, Inc. are no longer operating entities.

**B.     Corporate History**

21.     Debtor Job.com was incorporated in 2015 as a subsidiary of non-debtor MJM Tech Ltd. ("**MJM Tech**"), a company based in the United Kingdom and co-founded by Paul Sloyan and Arran Stewart. Until May 7, 2025, Messrs. Sloyan and Stewart comprised the board of directors of Debtor Job.com and acted as Debtor Job.com's Chief Executive Officer and Chief Visionary Officer, respectively. Upon information and belief, Messrs. Sloyan and Stewart were also officers and/or directors of the other Debtors until May 7, 2025 and are officers and currently directors of MJM Tech.[10]

22.     Job.com originally offered a job-matching system that intelligently matched jobs to candidates using their uploaded resumes. Job.com expanded its operations beginning in 2020

---

[10]     Upon information and belief, Mr. Sloyan is the President of the non-Debtor subsidiary of MJM Tech, Job.com-Team.ai Inc. The board and management of the Debtors have no role in the operations or decision making of MJM Tech or Job.com-Team.ai Inc.

8

through the acquisition of various job search and staffing companies, including HireVergence in 2020, Fortus, Endevis and QCI in 2021, and Princeton Search in 2022.

## II.    The Debtors' Equity Ownership and Capital Structure

### A.    Equity Ownership

23.    As reflected in the Org Chart, the equity interests of Debtor Job.com, a Delaware corporation, are held by non-debtor MJM Tech.[11]  Job.com, in turn, owns 100% of the equity interests in the following Debtors: (i) Job.com-HV, Inc. (DE), a Delaware corporation, (ii) Job.com-HV, Inc. (FL), a Florida corporation, (iii) Job.com-Endevis, Inc., a Delaware corporation, (iv) Job.com-QCI Inc., a Delaware corporation, (v) Job.com-Fortus, Inc., a Delaware corporation, and (vi) Princeton One-Job.com, Inc. ("**Princeton One**"), a Delaware corporation. Princeton One holds 100% of the equity of Princeton Search L.L.C., a New Jersey limited liability company.

### B.    Capital Structure[12]

24.    The Debtors' current capital structure is generally described as follows:

#### a.    *Prepetition Credit Agreement*

25.    On November 4, 2022, the Debtors entered into that certain Credit and Security Agreement (the "**Prepetition Credit Agreement**", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, the "**Prepetition Credit Agreement Documents**"), by and among, *inter alia*, (a) Debtor Job.com, as borrower, (b) the other Debtors as guarantors, (c) Ankura Trust Company, LLC, as administrative agent (the

---

[11]    As discussed below, while MJM Tech still owns the equity in Debtor Job.com, it no longer has voting and shareholder rights.

[12]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable prepetition credit documents described herein.

9

"**Prepetition Credit Agreement Agent**"), and (d) Serengeti Multi-Series Master LLC-Series ARR, GT Partners Private Credit Finance LLC and GT Monterey Cypress Finance LLC (collectively, the "**Prepetition Lenders,**" and together with the Prepetition Administrative Agent, collectively, the "**Prepetition Secured Parties**"), pursuant to which the Prepetition Credit Agreement Lenders provided senior secured term loans to the Borrower (the "**Prepetition Credit Agreement Loans**").

26.    As of the Petition Date, the Prepetition Credit Agreement Loan Parties were indebted and liable to the Prepetition Secured Parties, in an aggregate principal amount of not less than $42,244,997.06, plus any other accrued and accruing unpaid interest, fees and expenses owing thereunder (collectively, the "**Prepetition Secured Obligations**"). Pursuant to the Prepetition Credit Agreement Documents, the Prepetition Secured Obligations are secured by legal, valid, binding, perfected, enforceable and nonavoidable first priority security interests in and liens upon (the "**Prepetition Liens**") the Collateral (as defined in the Prepetition Credit Agreement and referred to in this Declaration as the "**Prepetition Collateral**"). As discussed below, as part of the transaction, MJM Tech granted the Prepetition Secured Parties a stock pledge of its entire equity interest in Debtor Job.com (the "**Stock Pledge**").

i.    *Factoring Agreement*

27.    Certain of the Debtors are party to a Factoring and Security Agreement with Breakout Capital, LLC (the "**Factor**"), dated July 2, 2021 (as amended from time to time, the "**Factoring Agreement**") pursuant to which the Debtors have the option, but not requirement, to sell the Factor certain of their accounts receivables from time-to-time. Under the factoring arrangement, the Debtors advise the Factor from time-to-time when they have accounts receivable they wish to sell to the Factor and the Factor, in turn, can elect which of the accounts receivable it wishes to purchase. The Factor then pays the Debtors between 80% and 95% (depending on the

10

source of the accounts receivable) of the face value of the accounts receivable it purchases and charges the Debtors various fees and expenses on top of the incremental percentage of accounts receivable it collects.    In certain instances, the Debtors are obligated under the Factoring Agreement to repurchase the accounts receivable that the Factor purchased, such as accounts where payment has been disputed by the account debtor or the receivable exceeds a stated duration without collection.

28.    In order to harmonize the Factoring Agreement with the Prepetition Credit Agreement Loans and to allow the ongoing and future sale of the accounts receivable to the Factor, the Factor, on the one hand, and the Prepetition Administrative Agent, on the other, are party to that certain Subordination Agreement, dated November 4, 2022 (as amended from time to time, the "**Subordination Agreement**").    While the Factoring Agreement contemplates the optional sale of accounts receivable, the Subordination Agreement purports to establish lien priority among the Factor and the Prepetition Administrative Agent should the Factoring Agreement be determined to be a loan.    The Factor was additionally granted certain access and control rights over certain of the Debtors' bank accounts that, as of the Petition Date, the Debtors do not use.    As of the Petition Date, the Debtors ceased their option to sell any accounts receivable to the Factor.

        *ii.*    *Venture Debt Loans*

29.    Certain of the Debtors are party to the: (a) Business Loan and Security Agreement dated July 26, 2024 with Venture Debt, LLC ("**Venture Debt**") and (b) Business Loan and Security Agreement dated July 30, 2024 with Venture Debt (together, the "**Venture Debt Loans**"). Non-debtor MJM Tech and certain of its non-Debtor affiliates are also borrowers and/or guarantors of the Venture Debt Loans.    The Venture Debt Loans provided short-term financing to the Debtors in the original principal amount of $2,324,040.    As of the Petition Date, the Debtors owe Venture Debt approximately $1,500,000 on account of the Venture Debt Loans.

11

### iii.    Merchant Cash Advances

30.    Prior to the Petition Date, the Debtors entered into certain merchant cash advance agreements (collectively, the "**MCA Agreements**") with Gold Capital USA, Cedar Advance LLC, and Capital Assist, LLC (collectively, the "**MCAs**"). Pursuant to the MCA Agreements, the MCAs advanced certain amounts in exchange for a promise to repay a greater amount as and when the Debtors collected certain future receipts. The various MCA Agreements are styled as a sale of future receipts, but the Debtors believe that they are loans. As of the Petition Date, approximately $608,000 remains outstanding under the MCA Agreements.[13]

### iv.    SOJA Notes

31.    Debtors Job.com and PrincetonOne are parties to note purchase agreements with SOJA Ventures LLC and certain of its affiliates ("**SOJA**")[14] dated as of February 15, 2022 and March 7, 2024 (the "**SOJA Notes**"). Non-debtor MJM Tech is a co-borrower on certain of the SOJA Notes. As of the Petition Date, the total amount of principal and interest owed by the Debtors on account of the SOJA Notes is approximately $2,459,000. According to available records, the SOJA Notes are unsecured since the collateral rights purportedly granted thereunder are contingent upon not violating the Prepetition Credit Agreement Documents and the SOJA Notes would do so. Therefore, if the SOJA Notes are valid obligations of the Debtors (which they may not be), they are unsecured.

### v.    Trade and Other Unsecured Debt

32.    As of the Petition Date, the Debtors' books and records list approximately $20 million in outstanding trade and other unsecured liabilities.

---

[13]    Nothing herein shall be construed as an admission as to the validity, nature, or amount of any claims asserted by the MCAs, and the Debtors reserve all rights to dispute any such claims.

[14]    SOJA holds certain warrants in non-Debtor MJM Tech.

17411232

### III.    Circumstances Leading to these Chapter 11 Cases; Chapter 11 Objectives

#### A.    The Debtors' Business Faces a Number of Significant Challenges

33.    The Debtors' financial difficulties stem, in part, from overexpansion into the job search and staffing industry.  As discussed above, between 2020 and 2022, the Debtors acquired five recruitment and staffing businesses.  The Debtors expended significant resources acquiring these entities, and, once acquired, failed to control the costs of these business lines.

34.    In addition, while the Debtors saw growth in revenue as the result of the high demand for healthcare staffing during the COVID-19 pandemic, the staffing and recruitment industry as a whole saw major realignment during 2023.  With this in mind, the Debtors decided to pause their acquisition strategy, focusing instead on the development of their technology portfolio, aligning their current staffing companies into one brand, Job.com, and reducing operating expenses.  In an effort to generate cash, the Debtors divested their recruitment process outsourcing business, albeit at a loss.  However, with this divestiture came a drop in revenue. While the Debtors had revenue exceeding approximately $100 million in the year ending December 2022, revenue for the year ending December 2024 was approximately $33 million and they are projecting 2025 fiscal year revenue of $15 million.  The Debtors' first quarter 2025 gross revenue was approximately $3.5 million.  Ultimately, the Company's efforts during this time focused heavily on the development of technology, and less on its traditional recruiting and staffing business.

35.    To compound matters further, it appears that the Debtors' operations and management suffered from disorganized and, at times chaotic, stewardship under their former management.  For example, it appears payroll and payroll tax withholdings were not properly done, the Company entered into numerous transactions where it purported to sell or pledge the sale collateral multiple times, and the Company's records appear to be significantly de-centralized and

13

disorganized. It appears that prior management's approach to running the Company has had a deleterious impact on the Company, its operations, its internal culture, and viability.

36.     Beginning in 2023, the Debtors were unable to make various payments of principal and interest under the Prepetition Credit Agreement due to constrained liquidity, resulting in the Prepetition Secured Parties declaring events of default under the Prepetition Credit Agreement. In November 2023, the Debtors and the Prepetition Secured Parties entered into a forbearance agreement pursuant to which the Prepetition Secured Lenders agreed to forbear from exercising their rights and remedies with respect to these events of default until January 31, 2024.

37.     Nevertheless, the Debtors continued to face financial and operational pressures, resulting in the loss of key vendors. With the loss of several important vendors, the Company's job search and staffing businesses suffered greatly, and essential employees began to quit. In February of 2025, the Debtors were forced to shutter their per diem healthcare staffing business, QCI, when all of QCI's employees quit due to the Company's failure to timely pay wages. The Debtors also became unable to make payments to the MCAs, resulting in one MCA, Gold Capital USA, garnishing certain of the Debtors' bank accounts.[15] Two of the Debtors' bank accounts were also garnished as the result of a judgment against the Company obtained by Commercial Investigations LLC in the amount of $104,415.31.

**B.     Prepetition Governance Changes and Actions to Stabilize the Company**

38.     In February of 2025, the Debtors retained CorlissMoore to assist in assessing its business operations and collaborate on financial and operational alternatives, among other things. Two things were readily apparent shortly after our involvement: the situation was serious. The CorlissMoore team worked with then-management to try to stabilize the business, fend off

---

[15]    The Gold Capital USA garnishment resulted in the restriction on the use of funds in these bank accounts, but the bank ultimately released these funds.

17411232

creditors (several who had already commenced litigation or obtained garnishments), comfort employees, organize the Company's finances and bring order to chaos. Further, since its retention, the CorlissMoore team has been working to understand the full extent of the potential mismanagement that occurred under the former executives of the Company. CorlissMoore has been working with the Company's advisors and the Independent Director to correct the ship, and this bankruptcy filing will enable us to further and finally understand the extent of the pre-petition operations of the Company and the extent of prior managements missteps.

39.    Due to this worsening situation and the existence of one or more Events of Default under the Prepetition Credit Agreement, on May 7, 2025, the Prepetition Agent exercised its rights under the Stock Pledge to: (a) remove all then-existing members of the Debtors' board of directors with immediate effect, (b) appoint David Mack[16] of Drivetrain, LLC, a seasoned professional independent fiduciary with over twenty years of experience in bankruptcy, restructuring, and complex litigation, as the sole independent director of each of the Debtors' boards (the "**Independent Director**"), and (c) install me as the Chief Executive Officer of Job.com in place of the former Chief Executive Officer.[17] Thereafter, the Debtors appointed Benjamin Gross and Robert Corliss, Jr. (both of CorlissMoore) as the Debtors' Chief Administrative Officer and Chief Operating Officer, respectively.

40.    Since May 7th, Messrs. Mack, Gross, Corliss and I have taken a number of steps to remedy the prior mismanagement of the Company and stabilize the Company's operations. Critically, we engaged in negotiations with the Prepetition Secured Lenders regarding funding to

---

[16]    Mr. Mack has been an independent fiduciary in several previous matters before this Court, including in the *Zohar Corp.* (non-debtor portfolio company sold by the debtor), *BL Santa Fe*, *DeCurtiss Holdings* and *TerraForm Labs* (debtor's independent director) cases.

[17]    Thereafter, I was appointed the Chief Executive Officer of the other Debtors.

address the Company's immediate liquidity constraints. As a result of these negotiations, since April 25, 2025, the Prepetition Secured Lenders provided approximately $3,865,148 in bridge financing (the "**Prepetition Bridge Loans**"), which was crucial to ensure the continued operation of the Debtors' business. In addition, we worked feverously to stabilize relationships with key vendors and employees, which had been severely damaged as a result of prior mismanagement. We secured the Company's operating cash by opening a new bank account, ensured current employee wages were funded in full (including proper federal tax withholdings), met with various key creditor constituents, rolled out a communications package to try to repair damage to corporate culture, and scheduled and participated in bi-weekly board of director meetings.

41.     The Independent Director, with the assistance of the Company's management and advisors, considered several potential restructuring alternatives before ultimately concluding that commencing these chapter 11 cases and a court-approved sale process (the "**Sale Process**") was the only viable path to preserving and maximizing the value of the Debtors' assets. In furtherance thereof, the Debtors selected Configure Partners, LLC ("Configure") an experienced investment banking firm, to assist with the Sale Process. Leading up to the Petition Date, the Debtors also engaged in discussions with the Prepetition Secured Lenders regarding the Sale Process and the commencement of these Chapter 11 Cases, which culminated in the execution of a stalking horse asset purchase agreement (the "**Stalking Horse APA**") by Job.com Acquisition Co., LLC , an affiliate of the Prepetition Secured Lenders, and a debtor-in-possession financing facility (the "**DIP Facility**"), each of which is discussed in more detail below.

## C.     The Stalking Horse APA

42.     Following weeks of analysis and process and considering the circumstances presented by the Debtors' state of affairs, the Independent Director approved the Debtors' entry

17411232

into the Stalking Horse APA, determining that pursuing a sale of all or substantially all of the Debtors' assets (the "**Assets**") pursuant to the Bidding Procedures (defined below) and executing the Stalking Horse APA provided the best opportunity to maximize value for all stakeholders. The Debtors executed the Stalking Horse APA with affiliates of the Prepetition Secured Lenders (the "**Stalking Horse Purchaser**"), who will serve as the stalking horse bidder in a Sale Process pursuant section 363 of the Bankruptcy Code, subject to Bankruptcy Court approval. The Stalking Horse APA contemplates a credit bid for a total purchase price of $35,000,000, including (x) the balance outstanding under the DIP Credit Agreement and (y) a portion of the amount due under the Existing Credit Agreement on the closing date. As part of the purchase price, the Prepetition Lenders have also agreed to assume certain liabilities (including contract cure costs).

43.     The Stalking Horse APA provides the best option to maximize value for the Debtors' estates. The Debtors' consummation of any sale pursuant to the terms of the Stalking Horse APA is subject to higher or otherwise better offers that the Debtors may receive for the Assets pursuant to the Bidding Procedures Motion (as defined below). Further, the Stalking Horse APA benefits the Debtors by serving as a floor for an overbid process to ensure that the Debtors receive the highest or otherwise best offer for the sale of the Assets. Accordingly, if the Debtors were to continue to market the Assets without the benefit of the Stalking Horse Purchaser serving as the floor, the Debtors might encounter greater challenges in their pursuit of the highest or otherwise best offer for the Assets.

44.     Therefore, the Debtors believe that, subject to Court approval and under the supervision of the Court, the proposed Sale Process will allow them to move their Chapter 11 Cases forward with much needed certainty provided by the contemplated sale, and with a clear message to the Debtors' employees, customers, vendors, and the marketplace, all of which the

17411232

Debtors believe is necessary and critical to the success of their chapter 11 efforts and the preservation of their business operations.

### D.    The Bidding Procedures Motion

45.    The Debtors are pursuing a value-maximizing transaction in the first approximately ninety (90) days of these Chapter 11 Cases.  The Sale Process has been designed in accordance with the milestones for these Chapter 11 Cases, in keeping with the Debtors' liquidity position and as contemplated by the Stalking Horse APA and the DIP Motion (as defined below) (collectively, the "**Case Milestones**").

46.    In accordance with the Case Milestones, the Debtors will be filing a motion (the "**Bidding Procedures Motion**") seeking authority to proceed with a bidding and auction process to consummate a sale (the "**Sale**") that the Debtors expect will generate maximum value for the Assets.  To facilitate the Sale, the Debtors, in consultation with Configure Partners and their other professional advisors, will propose certain customary bidding procedures (the "**Bidding Procedures**") to preserve flexibility in the Sale Process, generate the greatest level of interest in the Debtors' Assets, and result in the highest or otherwise best value for those Assets.  Among other things, the Bidding Procedures Motion will seek approval of Bidding Procedures that, in the Debtors' business judgment, will create an appropriate timeline for the Sale Process, consistent with the Case Milestones.  Also, given the Debtors' current liquidity situation, the Debtors believe that a prompt sale of the Assets will maximize value to the greatest extent possible under the circumstances of these Chapter 11 Cases, and generate the highest possible recoveries in the most efficient and expeditious manner possible, which will inure to the benefit of the Debtors' creditors and other stakeholders.  The Debtors also believe that it will ensure, to the benefit of their estates, that the market has certainty around the parameters of the Sale Process.

17411232

**E.    DIP Financing**

47.    To enable the Debtors to fund the administration of these Chapter 11 Cases and the Sale Process, the Debtors, through their professional advisors, engaged in negotiations with the Prepetition Secured Lenders regarding postpetition financing and the consensual use of cash collateral.  After arm's length negotiations, the Prepetition Secured Lenders agreed to fund the DIP Facility, comprising of: (a) new money loans in the aggregate principal amount of approximately $6,065,000, and (b) subject to entry of a Final DIP Order (as defined below) roll-up loans in the aggregate principal amount of approximately $3,865,148 representing a roll up and conversion on a dollar-for-dollar basis of a corresponding amount of the Prepetition Bridge Loans. Of this amount, $2,000,000 shall be made available on an interim basis upon entry of an interim order (the "**Interim DIP Order**") and $9,900,000 shall be made available on a final basis upon entry of a final order (the "**Final DIP Order**"), in each case in accordance with an approved budget.

48.    The Prepetition Secured Lenders also agreed, in connection with the DIP Facility, to the consensual use of prepetition cash collateral (the "**Cash Collateral**").  The DIP Facility and access to Cash Collateral will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during these Chapter 11 Cases, and to run a Sale Process to achieve a value-maximizing sale of the Assets.

49.    The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral, among other things, to fund working capital requirements, costs, and expenses of administration of the Chapter 11 Cases and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases.  Without access to the DIP Facility and the continued use of Cash Collateral, the Debtors and their estates would suffer

17411232

immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business, or preserve the going-concern value of their estates, without access to the DIP Facility and the authorized use of Cash Collateral.

50.    I believe that the DIP Facility is the best source of debtor-in-possession financing available to the Debtors at this time. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. I do not believe that the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured only by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Secured Parties on terms more favorable than the terms of the DIP Facility. I believe the only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of the Interim DIP Order to satisfy their postpetition liquidity needs.

51.    The DIP Lenders have indicated a willingness to provide the Debtors with the DIP Facility, but solely on the terms and conditions set forth in the Interim DIP Order and in the DIP Loan Documents. Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided

17411232

by the DIP Lenders pursuant to the terms of the Interim DIP Order and the DIP Loan Documents represents the best financing currently available to the Debtors.

52.     I further believe that the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.

53.     The DIP Facility contemplates the following Case Milestones:

- By no later than three (3) business days following the Petition Date, the Bankruptcy Court shall enter the Interim DIP Order.

- By no later than five (5) business days following the Petition Date, the Debtors shall have filed a motion seeking approval of a bidding procedures order (the "**Bidding Procedures Order**") for the Sale, in form and substance acceptable to the Prepetition Secured Parties.

- By no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final DIP Order authorizing the DIP Facility, in form and substance acceptable to the Prepetition Secured Parties.

- By no later than days thirty (30) days following the Petition Date, the Debtors shall have obtained entry of the Bidding Procedures Order (including the timelines set forth therein), in form and substance acceptable to the Prepetition Secured Parties.

- By no later than eighty (85) days following the Petition Date, the Debtors shall have obtained entry of an order from the Bankruptcy Court approving the Sale.

- By no later ninety (90) following the Petition Date, the Sale shall have closed.

17411232

54.      I believe that time is of the essence in consummating the Sale of the Debtors'
Assets.  The Debtors are rapidly consuming cash and cannot afford an extended stay in chapter 11.
The Debtors vigorously negotiated for the largest postpetition financing commitment and longest
maturity possible to afford enough time to market their Assets.  Absent a consummation of a sale
on the timeline contemplated by the Case Milestones, I believe the Debtors' business would be at
significant risk of liquidating, which would cost jobs and erode recoveries for creditors.

**IV.      First Day Pleadings**

55.      I have reviewed each of the First Day Pleadings, including any exhibits thereto,
which include the following:

- *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

- *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent Effective as of the Petition Date;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Redact Personally Identifiable Information for Certain Individual Creditors and Parties in Interest; and (II) Granting Related Relief;*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-1, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Waiving the Requirements of Section 345(b) on an Interim Basis, (D) Approving, Upon Entry of a Final Order, the Debtors' Use of Certain Garnished Funds, and (E) Granting Certain Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Confirming, Restating, and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief;*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(A), 363(B), 507(A)(8), 541, 1107(A), and 1108 Of The Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing;*

17411232

- *Debtors' Motion for Entry of an Order (I) Compelling Debtors' Former Officers and Other Required Persons to Turn Over Records and (II) Granting Related Relief;*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (II) Continuation of Insurance Premium Financing Programs; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing;*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Service Providers; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing the Debtors to Pay and Honor Certain (I) Prepetition Wages, Benefits, and Other Compensation Obligations; (II) Prepetition Employee Business Expenses; and (III) Workers' Compensation Obligations; (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (C) Granting Related Relief; and*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expenses Status, (IV) Granting Adequate Protection to the Prepetition Secured Lenders, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

56.    As a result of my experience, through my review of various materials and information, and discussions with the Debtors' advisors, I believe that the relief requested by the First Day Pleadings is necessary to enable the Debtors to preserve and maximize the value of their estates, to prevent immediate and irreparable harm to which the Debtors and their business would be exposed unless the relief requested in the First Day Pleadings is granted, and to efficiently implement their restructuring efforts without disruption or delay. As such, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

57.    I believe the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge and understanding and incorporate such facts herein by reference.

17411232

Docusign Envelope ID: 7960F47E-6C5C-4712-9BF5-409305132355

58.     The relief sought in the First Day Pleadings is critical to the success of the Chapter 11 Cases and granting such relief will reduce unnecessary disruption to the Debtors' business and operations, thereby maximizing value for the Debtors' estates.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: July 6, 2025

Signed by:

*Robert J. Corliss*

ADF9CD17B46B49F...

Robert J. Corliss
Chief Executive Officer

17411232

**<u>Exhibit 1</u>**

**Org Chart**

17411232

Case 25-11280    Doc 13-1    Filed 07/06/25    Page 2 of 2



*Figure 1*